UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUMBOLDT BAYKEEPER, et al., | No. C 06-02560 JSW (WDB) |
| Plaintiffs, | OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR PROTECTIVE ORDER |
| v. | |
| UNION PACIFIC RAILROAD COMPANY, CUE VI, et al., | |
| Defendants. | |
| _____/ | |

**I.
INTRODUCTION**

Humboldt Baykeeper and the Ecological Rights Foundation brought this suit alleging that defendants (among whom CUE VI is the principal real party in interest) have been and continue to be in violation of various statutes and regulations whose purpose is to protect against environmental contamination. The property that is the subject of this litigation is called the Balloon Track. There is no dispute that it has been contaminated. As part of the discovery process in this matter, plaintiffs want to send a team of specialists on to the property to take measurements and conduct tests to assess the character and extent of the contamination and to define the scope of the wetlands the property allegedly contains. CUE VI (hereafter simply 'defendant' or 'CUE') has filed a motion for a

1

1 protective order, the most significant provision of which would prohibit plaintiffs
2 from disclosing to anyone not a party to this litigation any of the information that
3 the plaintiffs' specialists acquire during the course of their inspection and testing
4 on the contaminated site.  For the reasons explained below, the Court DENIES
5 defendant's  motion for a protective order that would so limit plaintiffs' use of this
6 information.

## II.

## THE RELEVANT LAW

There are two grounds on which plaintiffs might contest issuance of the proposed protective order:  one is rooted in the First Amendment to the Constitution of the United States, the second is rooted in Federal Rule of Civil Procedure 26(c),  which permits district courts to issue protective orders only on a showing of good cause.

In Seattle Times v.  Rhinehart, 467 U.S. 20 (1984), the Supreme Court rejected the contention that there is a generalized prohibition, rooted in the First Amendment, against the issuance of appropriately grounded and limited protective orders.   The Court did not, however, suggest that protective orders that prohibit a party from disclosing information acquired in discovery could not invade interests protected by the First Amendment.  While the Court declared that information acquired through civil discovery was entitled to less Constitutional protection than information acquired from clearly public sources, the Court squarely acknowledged that the First Amendment imposes some restraints on issuance of protective orders.  The measure of those restraints is reflected in the test that the Court said it would apply to determine whether pretrial protective orders in civil cases conformed to Constitutional mandates.  Under this test, (1) the prohibitions imposed by protective orders  must further an important or substantial

2

governmental interest that is unrelated to the suppression of expression, and (2) the limitations imposed by the orders on freedom of expression must be no greater than is necessary or essential to protect "the particular governmental interest involved." Id. at 32.

In addressing the First Amendment challenge to the protective order at issue before it, the Seattle Times Court identified several kinds of generalizable governmental interests that protective orders in civil cases could advance. After so doing the Court announced that protective orders that have been issued in compliance with the good cause requirement of Rule 26(c) will not run afoul of the First Amendment.[1]  Id. at 34-37.

Justice Powell's opinion for the Court does not articulate an analysis under the second prong of the test that he said the Court should apply. We must presume, however, that the second prong of the test has some meaning independent of the first prong, that the second prong is not mere surplusage. It follows that in at least some instances a protective order could be vulnerable to constitutional attack on the ground that the prohibitions it imposes reach appreciably farther than would be necessary to secure the important public ends that are proffered in support of issuance of the order.

The point of most significance for present purposes, however, is that the Seattle Times Court clearly acknowledged that protective orders can invade First Amendment rights. This acknowledgment is important because it dispels an inference that a casual reading of the opinion might otherwise suggest: that a protective order could be justified solely on the basis of a showing that a party who

---

[1] It appears that one primary purpose of the holding in Seattle Times was to discourage parties from challenging or resisting the entry of protective orders on generalized First Amendment grounds. This inference is supported in part by the fact that the Court abruptly announced a generalized holding (that reached far beyond the case before it) without even purporting to address the second element of the test that Court had announced it was to apply, and in part by the fact that the Court felt constrained to point out (in a footnote) that "heightened First Amendment scrutiny of each request for a protective order would necessitate burdensome evidentiary findings and could lead to time-consuming interlocutory appeals, as this case illustrates." Seattle Times, supra, at 37, fn. 23.

1  lawfully acquired information through civil discovery intended not only to use it in
2  the litigation but also to disseminate it in some other setting.  An order that
3  purported to be based solely on the generalized ground that, without it, a party
4  would disclose discovered information in some other setting clearly could invade
5  First Amendment freedoms but could not be said to further an important
6  governmental interest unrelated to the suppression of expression.

7  Support for this reading of Seattle Times emerges from Justice Powell's
8  emphasis on the fact that, under applicable rules of procedure, a protective order
9  can issue only on a showing by the proponent of "good cause."  The Seattle Times
10 Court clearly assumed that this rule-based requirement of a showing of "good
11 cause" has real meaning – a real meaning that, among other things, ensures that a
12 protective order will not issue unless the party asking the court to issue it
13 demonstrates that the order would advance or protect some legitimate interest other
14 than suppression of expression.  The proponent of the order must demonstrate that
15 the order would reduce a real risk of significant harm to an interest that is entitled
16 to protection under the law and that is independent of the proponent's (or the
17 court's) desire simply to keep the discovered information out of public view or
18 inaccessible to the authorities.   See, e.g., Foltz v. State Farm, 331 F.3d 1122,
19 1130-31 (9th Cir. 2003).

20 The high Court's explicit limitation of its ruling to a protective order that "is
21 entered on a showing of good cause as required by Rule 26(c)" should dispel
22 another potential misreading of the Seattle Times opinion.  Read hastily, Justice
23 Powell's opinion for the Court might be misunderstood to suggest that when trial
24 judges rule on a motion for a protective order they are simply to "weigh fairly the
25 competing needs and interests of the parties affected by discovery."  It is clear,
26 however, that the discretion a trial judge is to exercise under Rule 26(c) in deciding
27 whether to issue a protective order is by no means unbounded.  That Rule does not
28 make trial judges mini-legislatures, conferring upon them free reign to decide

4

which of the values or interests of the parties are most important or most deserving of judicial solicitude.  Instead, before any judicial balancing begins, Rule 26 (c) gives some precedence to one particular value:  freedom to use discovered information in any lawful manner that the discovering party chooses.  That precedence is reflected in the Rule's demand that trial courts not issue protective orders unless the proponent of the order first makes a showing of good cause.  Without such a showing, no such order can issue.

There simply is no reason to believe that the drafters of Rule 26(c) did not intend to create a presumption against the issuance of protective orders.  Had they not wanted to create any presumption, it would have been obvious how to achieve that end: omit the good cause requirement.  Similarly, it would have been obvious how to write the Rule if the drafters had wanted to create a presumption against use of discovered information for any purpose external to the litigation: they simply would have inserted into Rule 26 a provision that prohibited any such use absent a stipulation of all parties or a court order that could issue only after a showing of good cause for the specific intended external use.[2]

So the Rule creates a presumption in favor of freedom of dissemination.  Placed by the law on the scales before the trial court begins any "balancing," this presumption *pre-weights the scales against restricting* a party's lawful use or dissemination of discovered information.  While this weight might not be great in some settings, it is real and it is rooted, in part, in the First Amendment.  As such, it cannot be outweighed by merely speculative threats of harm to other interests.  Instead, the proponent of a protective order must demonstrate that the risk of

---

[2] One might well suspect substantial resistance in Congress to any proposed rule that would create a presumption against dissemination or use of information outside the litigation in which it was discovered.  Such a presumption might be perceived as threatening the viability of the nation's long-standing and wide-spread reliance on private attorneys general for enforcement of both public and private rights.  A presumptive prohibition against any use of discovered information outside the litigation  might impair the ability of the public and its private attorneys-general to identify the sources and scope of invasions of important rights – thus compromising society's ability to take appropriate prophylactic or corrective action.  A presumption against any external use of discovered information also would seem to run counter to the spirit that animates sunshine laws in many states.

5

1  disclosure is real and that if the disclosure occurred it "would cause an identifiable,
2  significant harm." Foltz, id., at 1131, quoting with approval Deford v. Schmid
3  Prods. Co., 120 F.R.D. 648, 653 (D. Md. 1987).  See also Pansy v. Borough of
4  Stroudsburg, 23 F.3d 772, 786-87 (3d Cir. 1994) (endorsing the notion that, to
5  make the kind of "good cause" showing that is necessary to justify issuance of a
6  protective order, the moving party must demonstrate that "disclosure will work a
7  clearly defined and serious injury to the party seeking closure.  The injury must be
8  shown with specificity. . . . [citation omitted]  'Broad allegations of harm,
9  unsupported by specific examples or articulated reasoning,' do not support a good
10 cause showing." [citation omitted]).

11      By definition, a protective order must protect against something – something
12 negative. The kinds of 'negatives' that the cases have recognized as offering
13 potentially appropriate justifications for protective orders can be divided into three
14 categories: (1) abuses or misuses that are internal to the litigation process or that
15 threaten the fair adjudication of the case, (2) improperly motivated harm to
16 interests that are external to the litigation, or (3) unintended but harmful collateral
17 consequences to legitimate interests that are external to the litigation.

18      Examples of abuses or misuses that are internal to the litigation process
19 would include launching over-broad discovery probes for the purpose of imposing
20 unnecessary expense on an opponent, or distracting an opponent from more
21 productive work, or delaying progress toward trial. Examples of improperly
22 motivated external uses could include attempts to annoy or embarrass an opponent
23 or a witness, or to use or divulge an opponent's trade secrets for competitive gain
24 or to acquire leverage in settlement negotiations.  The Seattle Times case offers a
25 good example of the third category of "negatives" that protective orders may be
26 designed to address: likely inadvertent invasion of non-parties' rights of privacy,
27 freedom of  religion, or freedom of association. Seattle Times, supra, at 2210, fn.
28 24, and the concurring opinion by Justice Brennan, joined by Justice Marshall.

At a more general level, Seattle Times also reminds trial courts that an important systemic value that protective orders may serve is to reduce fears about litigation (expense, invasions of privacy, burdensome distractions, etc.) that can dissuade parties whose rights have been violated from even trying to use the courts to seek redress. Id. at 36, fn. 22.

## III.
## APPLICATION OF THE LAW

Has CUE made a showing of good cause that entitles it to issuance of a protective order?

CUE has not made a serious effort to persuade the Court that the site inspection and the testing and sampling that plaintiffs propose would constitute an abuse of the discovery process. Defendant has suggested, but has not persuasively shown, that some of the proposed targets of inquiry are irrelevant and that the amount of time for the proposed inspection is excessive. The record defendant has made simply is insufficient to support a finding that the proposed discovery would impose an unjustifiable expense, is over-broad, or is being pursued from some improper litigation purpose (e.g., to delay the proceedings or to harass defendant into making litigation concessions).

Defendant also has failed to show that if plaintiffs are not restrained by court order they will use the information they discover on defendant's site for improper purposes outside this litigation. Defendant contends that plaintiffs intend to present the results of their inspection and testing to governmental authorities who are responsible for assuring that defendant complies with environmental laws when they build the development they propose. Plaintiffs do not deny that they might so use information they acquire through the site inspection. They contend, however, that such a purpose is in no sense "improper." The Court agrees. If the legislative and administrative bodies that have established the pertinent administrative

7

procedures have determined that it is proper for the authorities to consider information submitted by interested citizens or groups, it would be unseemly (at a minimum) for this Court to rule that presenting such information would be "improper."

Defendant counters by arguing that it is "improper" to use the discovery tools that are provided for use in civil litigation to acquire information for presentation in an administrative proceeding that includes no provisions for "discovery." Defendant asserts that the administrative proceedings that lie ahead provide no tools by which non-parties could acquire the kind of information plaintiffs could acquire through their proposed site inspection in this case. Defendant contends, in essence, that plaintiffs are misusing the court system to end-run limitations that cabin the development of relevant information in administrative proceedings.

Clearly, however, a court cannot base a conclusion that a party is abusing the judicial process solely on the ground that that party is simultaneously seeking related relief in an administrative setting. There is nothing inherently unlawful or even suspicious about participating at the same time and for the same general purposes in processes sponsored by two branches of government.

Moreover, defendant has offered no evidence that the authorities who designed the administrative proceedings made a policy determination that having access to the kind of information plaintiffs hope to present would distort or impair their process, or that it would threaten some kind of unfairness to any participant. We presume that the administrative authorities are quite capable of deciding what, if anything, to do with the information plaintiffs hope to provide; surely we cannot presume that those authorities will permit some untoward, unfair, or unreliable use of information presented to them.

Nor has defendant shown that plaintiffs are improperly or unjustifiably in federal court. Defendant has not shown that plaintiffs do not have standing to

bring this case. Defendant has not prevailed on a jurisdictional challenge or on any attack on the justiciability of the claims in the pending complaint. It has not shown that plaintiffs' case offends Rule 11 or is vulnerable under Rule 12, and it has not shown that it is entitled to judgment under Rule 56.[3] Defendant has not even argued that plaintiffs are not entitled, under the rules of discovery, to most of the information that plaintiffs seek through the site inspection. In other words, defendant essentially concedes that there was nothing legally improper about the filing of the lawsuit and that the discovery in issue here is proper for litigation purposes. Given all these concessions and non-showings, on what basis could the court conclude that plaintiffs are misusing the judicial system and its processes?

Defendant seems to be reduced to arguing that the real motive that animates the plaintiffs' lawsuit and the plaintiffs' desire to proceed with the site inspection is to block defendant's development project altogether. The plaintiffs' plan, according to defendant, is to use the information they collect through civil discovery either to persuade the administrative authorities to deny the necessary permits or to increase the developer's transaction costs (directly and by delays) past the point where the project could be profitable.

While we certainly cannot eliminate the possibility that such motives underlie both this lawsuit and the plaintiffs' anticipated participation in the administrative proceedings, on the record before us it is at least equally likely that plaintiffs' motivation is neither sinister nor improper – but simply to increase the likelihood that defendant will comply with the relevant environmental regulations as it proceeds with its plans to clean up and then develop the property. Given the state of the record, we simply cannot conclude that defendant has shown that it is an improper purpose that drives plaintiffs' desire to be able to share the information they acquire through this discovery with the administrative authorities or with other groups who are concerned about environmental issues.

---

[3] The rules referenced in the text are in the Federal Rules of Civil Procedure.

Nor is there any risk that declining to issue the proposed protective order might discourage people whose rights have been invaded from turning to the courts for relief: it is the plaintiffs who want to disclose the discovered information and the defendants who want to keep it under wraps.

The last category of "negatives" whose prevention might support issuance of a protective order consists of unintended but harmful collateral consequences to legitimate interests that are external to the litigation. Unlike the situation in the Seattle Times case, defendant in the case at bar has not identified any non-parties who have privacy or First Amendment interests that might be harmed by public disclosure of the results of the site inspection.

The only proffered privacy rights that are implicated by the proposed discovery are defendant's. Pointing out that the subject property is privately owned and is fenced so as to prevent public access, defendant contends that disclosure of the results of the proposed inspection and tests will invade their privacy rights. Defendant has failed to persuade the Court, however, that the privacy rights that they seek to protect are substantial.

Whatever privacy interests that defendant has in the character and extent of the contamination on the property it intends to develop for use by the general public are quite limited – and the proposed discovery by plaintiffs would result in only modest additional intrusions on those limited rights.  Defendant knew when it bought this property that the government – and the public that the government represents – would have a considerable and legitimate interest (1) in assuring that the widely acknowledged contamination on the site was cleaned up and (2) in making sure that the development of the property is in compliance with environmental regulations. So when they bought the property with the intent of developing it, defendant knew that it would be the subject of considerable and probing scrutiny by agents of the public.  Defendant also knew that the process of securing permits for the anticipated development would include public exposure of

1    a great deal of information about the condition of the property and the nature and
2    extent of its contamination.  And it knew that these are matters of acute concern to
3    active and vocal segments of the local population – segments it should have
4    expected to be well represented at relevant administrative proceedings and to push
5    for more searching examinations of the property and more demanding reviews of
6    defendant's plans.
7    　　　　Because all of this was foreseeable, defendant could not reasonably have
8    expected that the nature and severity of the contamination on its property would
9    remain its private information. It follows, as a matter of law, that whatever
10   'privacy' interest it may have had in information about the contamination on its
11   property could not be deemed substantial.  Because that privacy interest must be
12   deemed slight, the controlled further intrusion into it that the plaintiffs' proposed
13   inspection and testing would involve could not constitute 'significant harm.'  The
14   prospect of avoiding limited incremental harm to a very modest interest  is simply
15   an insufficient predicate for a finding of the kind of "good cause" that is necessary
16   to overcome the presumption against issuing  protective  orders that is imposed by
17   Rule 26(c).
18   　　　　If the defendant had shown that its privacy interests were weightier and that
19   the likely intrusions were substantial, would it necessarily follow that defendant
20   had satisfied the "good cause" requirement of Rule 26(c) such that it would be
21   entitled to issuance of a protective order?  The answer is no.  At least in some
22   circumstances, as an essential element of the process of exercising the "broad
23   discretion" conferred by Rule 26(c), courts should proceed to an additional stage of
24   analysis – a stage in which the courts would "weigh fairly the competing needs and
25   interests of parties affected by discovery."  Seattle Times, supra, at 36.
26   　　　　When it engages in this final-stage weighing, may a court take into account
27   interests beyond those of the litigants themselves?  The Seattle Times decision
28   clearly answers this question in the affirmative – as it acknowledged the propriety

11

of the court giving dispositive weight (in the ultimate balancing analysis) to the privacy and First Amendment interests of non-parties. Other courts also have endorsed the proposition that it is appropriate for a court that is deciding whether to issue a protective order to take into account interests of non-parties, including public agencies or the public generally, when it appears that issuance of a proposed protective order could have an appreciable effect on such interests. See, e.g., Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d Cir. 1995); Pansy v. Borough of Stroudsburg, supra, at 786-88; Farnsworth v. Proctor & Gamble Co., 758 F.2d 1545, 1547 (11th Cir. 1985); Marrese v. American Academy of Orthopaedic Surgeons, 726 F.2d 1150, 1158-62 (7th Cir. 1984) (rev'd on other grounds, 470 U.S. 373 (1985)); In re Eli Lilly & Co., Prozac Prod. Liability Litig., 142 F.R.D. 454 (S.D. Ind. 1992).

Thus, if the defendant had shown that the privacy interests that would be implicated by the site inspection were substantial, the court would proceed to weigh the competing interests that the proposed protective order would affect – interests of the parties as well as interests of others, including the public.

In that balancing exercise, would it be appropriate to give some weight to the First Amendment interests of the plaintiffs (the parties who want to be free to share the information they discover during the site inspection with public agencies, other interested private groups, and the public generally)?  In the process of distinguishing rule-compliant protective orders from the more commonly litigated prior governmental restraints on disclosing information acquired from non-private sources, the Seattle Times opinion makes it clear that "judicial limitations on a party's ability to disseminate information discovered in advance of trial implicates [sic] the First Amendment rights of the restricted party to a far lesser extent than would restraints on dissemination of information in a different context." Id. at 34. But Seattle Times leaves no doubt that protective orders that restrict or prohibit dissemination of discovered information invade in some measure  First

12

Amendment rights – and there is nothing in this seminal opinion that would prohibit a trial court, when exercising its discretion to determine whether the "good cause" standard has been met, from giving some weight in the balancing to the freedom a party otherwise would have to share the information learned through the discovery process. While, after Seattle Times, a trial court apparently would err (at least in most circumstances) if it purported to give dispositive weight to this particular kind of First Amendment interest, a trial court also would err if it ignored this party interest altogether.[4]

The error that ignoring this kind of party interest altogether would entail would be magnified when, as in the case at bar, the discovered information might well make a significant contribution to the advancement of important public policies. The kind of information that plaintiffs seek in this case through the site inspection likely would improve the ability of governmental agencies to assure the

---

[4] Justice Powell, speaking for the Court in Seattle Times, acknowledged that the protective order that was being challenged in that case prevented dissemination of information in which the public would likely have considerable interest. So the Court clearly understood that the order it was sustaining (against an attack based on the First Amendment) circumscribed freedom of expression. Seattle Times, supra, at 31.

It does not follow, however, that the Court would rule that trial courts should refuse to take any First Amendment interests into account when they are deciding, in the first instance, whether to issue a protective order. The order at issue in the Seattle Times case had already been entered – the trial court had already conducted the balancing analysis that Rule 26(c) requires. What Justice Powell was rejecting was an after-the-fact attack, based wholly on the First Amendment, on an order that already had been entered, i.e., on the outcome of the balancing test as determined by the trial court after it had weighed fairly the competing needs and interests that would be affected by the order (or its absence). There is no indication that, in conducting that analysis, the trial court ignored the adverse effects on First Amendment freedoms that its order would cause.

To hold that protective orders that already have been issued in compliance with Rule 26(c) standards generally will not be vulnerable to attack on First Amendment grounds is not to hold that, when conducting the balancing analysis before they decide whether to enter an order in the first place, a court is prohibited from taking any First Amendment interests into account. To suggest the latter would be to suggest that protective orders could not, as a matter of law, adversely affect any First Amendment interests that might come within the ambit of interests that might be entitled to some level of protection by the judiciary. But Justice Powell's opinion acknowledged that "[i]t is, of course, clear that information obtained through civil discovery authorized by modern rule so civil procedure would rarely, if ever, fall within classes of unprotected speech identified by decisions of this Court." Id. at 31. And Justice Brennan's concurring opinion, joined by Justice Marshall, emphasized (without rejoinder from Justice Powell) that "[t]he Court today recognizes that pretrial protective orders, designed to limit the dissemination of information gained through the civil discovery process, are subject to scrutiny under the First Amendment." Justice Brennan, concurring in Seattle Times, supra, at 37.

public that dangerous contaminants are removed from the subject property and that the proposed development of the site proceeds in conformity with applicable environmental law. These are important societal interests.

While we cannot know in advance how much the discovered information would contribute toward achieving these public ends, we do know that detecting and measuring the extent of contaminants that have been deposited on real property over long periods of time are technically difficult undertakings in which the risk of error is not inconsiderable. We also know that effective remedies can be fashioned only when the character and extent of the problems are accurately understood. Given the elusiveness of reliable data in these settings and the difficulty of such environmental assessments, we can safely assume that there is a substantial likelihood that the information the plaintiffs discover from the site will aid in achieving the public's purposes. The addition of the information that plaintiffs gather also could enhance the public's confidence that all significant hazards have been removed – and enhancing that confidence, by itself, is a public good. Increased public confidence in the state of the property also could redound to the benefit of the developers (defendants) by reducing apprehensions that might discourage visitors to the property and by increasing the market value of the real estate.

When we put all the implicated interests on the scales, we conclude that the balance tips clearly in favor of permitting plaintiffs to disclose the information they gather about the site. The defendant's privacy interest that could be affected adversely by disclosure is not substantial – while there is a real possibility that permitting the plaintiffs to share the results of their experts' tests and measurements with governmental agencies and other interested groups would contribute appreciably to securing unquestionably important public interests. It follows that the Court would deny defendant's motion for the protective order even

if defendant had made a showing sufficient to extend the court's analysis to the final balancing stage.

For all the reasons set forth above, defendant's motion for a protective order is DENIED.

Dated:   8-3-07

_____
WAYNE D. BRAZIL
United States Magistrate Judge

Copies to:

All parties,
JSW, WDB, Stats